Good morning, I'm Steve Parsons, appearing on behalf of the plaintiff and appellate Beverly Arum. With the court's permission and the cooperation of the clerk, I'd like to reserve five minutes for reply. You should try to keep track of your own time. I will, Your Honor. If I remember, I'll remind you, but you're on your own, basically. I'm going to rely also on the clock to the left of me, Your Honor. As the court's well aware, this issue presented to the court can be boiled down to three issues that have been raised on appeal. The first being whether or not the court below erred in granting summary judgment in light of what we believe to be three material facts, which the plaintiff appellant has the right to submit to a jury under the Seventh Amendment of the Constitution for determination factually. Secondly, the court below denied a motion for summary judgment, and because this is a dispositive motion that had been granted, has taken what is in essence an interlocutory decision on the applicability of an offset provision under state law and made that appealable before the court. The appellant urges the court to find that Nevada law precludes the offset in the manner in which the carrier has employed it here, or at minimum, the offset is such that the carrier has not complied with requirements of state law in providing for a maximum offset, allowing a minimum retention of benefit by the appellant, as well as the refunding of certain of the premiums that have been withheld in violation of the statute. Third, and I believe now less significantly, the court below used the Nevada state law upon applying the cost bill, originally saddling the plaintiff appellant with a cost bill in many tens of thousands of dollars, which now I believe the appellee by its brief concedes is inappropriate both under the case law of the circuit, as well as the rule that eliminates the ability to charge the losing party with the expert's fees. Counsel, if we were to agree with you on your first issue, that is that there remains an issue of fact for further proceedings, would we need to reach the cost issue one way or the other? No, ma'am, you would not. Why do you say that? If it goes back and there's a cost determination, doesn't it become relevant which law applies? It does ultimately, Your Honor. I don't think it does in terms of this being the ultimate cost bill determination. Right. But the question would still be before the district court, would it not, as to what law to apply? And, Your Honor, if I may, I believe the difference between the positions has been narrowed substantially. Right. Because the expert. That's correct, Your Honor. As well as I believe that I find it curious that the appellee has urged that this court's precedent from 1991 is somehow inapplicable because of the United States Supreme Court case of 1988. I believe the law of the circuit is abundantly clear, and on any consideration of this matter by the district court, applying what's the appropriate law would result in the appropriate cost bill. As the court may be aware, we were not able to be in a position to attack the cost bill. It was entered sui sponte by the district court after the appeal had been filed. Following the law of the circuit, we believe that necessarily came to this court as a basis of appeal. But we did not feel and have relied upon the precedence of the 1991 case to allow it to remain for this court's consideration. Again, impartial the thought being that if the matter is remanded for further proceedings, the cost bill becomes mooted, at least at this time. Well, you might win, in which case. There's no cost bill. Right. Yes, Your Honor. As to the three issues that we believe are still present for the court's determination below that are entitling us to go to a jury, it's quite simple that we had before the court three factual determinations which we believe are not only controverted, but in fact, according to the appellee's brief, they wish to characterize the evidence one way or the other. And I think that's the best evidence that both the court below and the appellee wish this matter to have been a weighing of the evidence by the district court, rather than the determination, which is well settled in this circuit, that there be no factual determinations that await adjudication. As we set forth in our brief, there were three final issues that we think, at minimum, mandate a trial upon the merits of this case, first being that the Social Security Administration had determined in a much more stringent standard that the appellant plaintiff had been disabled from any occupation in the United States economy for a period greater than 12 months. We believe and have cited thorough precedent to the court where under 11 cases, eight of which emanate from fellow circuits, that matter is an appropriate probative matter to bring before the court in consideration of whether or not the appellee breached the contract or engaged in bad faith. Secondly, though the appellee in its brief wishes to choose between the evidence it wishes to consider in making its determination, it has admitted that an attending physician statement required by their policy filed after they made the determination that my client was no longer disabled attested as the 33rd attestation by her physician, a board-certified psychiatrist, that she remained disabled from any occupation that she had previously had. Finally, and thirdly, and most importantly, the depo testimony of Dr. Christensen, after the suit had commenced, also reiterated that he believed that she was not capable of any gainful employment absent the requirement of retraining, which was not a bar to her benefits under this policy. Noticing that my time is waning, I'd like to move quickly on to the issue of the exclusion of benefits based upon a coordination that the plaintiff, excuse me, the appellee tried to enforce. As the court's aware, the appellee has conceded by its own pleading that they don't understand the schema of law in Nevada in that 681 through 689 does cover disability policies of insurance. Under the health law section, disability policies are regulated in the state of Nevada. They are called loss of time policies, and specifically in the definition in NRS 681, disability policies are ruled in as part of that statutory schema. So I believe that their position is wholly without merit and should be disregarded. Are you saying that this policy violates Nevada law? It does, Your Honor. Nevada law sets forth in 689-240 that there cannot be a reduction in premium on a purported offset issue by the contractor unless it meets the Nevada scheme. The Nevada scheme is really three parts. One, if it in fact does allow for an offset, then the offset can be taken only to a minimum of $300 benefits still being paid with the refund of premium earned during the prior two years. The appellee did not do that. Secondly, by implication and certainly by definition in other statutes, social security disability income should be most correctly characterized as group health insurance. Both by statute and by Attorney General's opinion, that implication is clear and we've cited that to the court where no other logical basis remains than to understand that the social security benefits were well known to the carrier at the time it created this policy and to attempt to voice its contractual obligation to the state, to the public fisc, by saying it's not covered by 689, seems to defy the statutory scheme in Nevada. Finally and most importantly, we believe the interpretation that's correct is to find that the social security disability income benefits are in fact group health coverage and are totally excluded from consideration of offset by Nevada law. I see my time has gone far beyond what I thought. With the court's permission, I'll reserve time to reply. Thank you. Good morning. My name is Ann Andrews. I'm with Lewis & Rocha and I represent the Paul Revere Life Insurance Company. I would suggest to your honors that this case actually boils down to a pretty simple and basic question of what the summary judgment standard is. So the question before the court today is whether Ms. Arum has adduced specific facts in support of her claims and whether those specific facts can allow a reasonable jury to find by a preponderance of the evidence that she met the policy standard. All the experts say that Ms. Arum can work. Ms. Arum's own treating physician, Dr. Christensen, testified repeatedly, I counted seven times in the excerpts of record, that she not only could work, but she should have been working all along. What did Paul Revere mean by the contractual provision that talks about considering your prior economic status? The any occupation standard, excuse me, as opposed to the own occupation standard, essentially takes a look at the person as a whole and says, but let me back up and just say the own occupation standard protects somebody from what they did before, what their occupation was before. And if they can't do that occupation, they get paid disability benefits regardless of whether they can do something else. The any occupation standard is a much more stringent standard under which you have to take a look at the entire person, you take a look at what their skill set is, what's their education, training experience, what was their prior situation. I think considering, or I think it says considering prior economic status, goes to that same general analysis. Doesn't that mean that somebody whose prior employment has been at very substantial economic return is not required to go back to, and I'm not just going to pick the extreme of flipping burgers, but something that's very close to that? And what is the evidence on that? Well, there's relatively little case law on what exactly the any occupation standard has to, or relates to in terms of the exact amount of money. What it means, though, from what the case law that, we actually cited some case law in the underlying briefs in the trial court, I don't think we repeated it in the briefs, but what the case law basically says is the any occupation standard offers much less protection than an own occupation standard, and something that provides a substantial income is sufficient. The case law that we cited, I think one of the cases was a person who could earn only 45% of his prior income that was sufficient to provide him enough income under an any occupation standard. The only evidence in this record, and it's not a numerical standard under the policy. Again, what you're looking at is what's reasonable. Take this person as a whole, what's reasonable to put this person into. However, the only evidence in this record is from the vocational expert, Dr. Janssen, who did an analysis of Ms. Arum's education training experience, her vocational possibilities, did a transferable skills analysis, and a job survey, a labor market survey. And what Dr. Janssen said was that she could get jobs that would have provided her. If you take a look, he didn't say this specifically, but if you take a look Her prior three-year average was right around 60-some-odd thousand. So if you take a look at what she was doing in the three years prior to her disability, we're looking at between 50-some-odd percent and 90-some-odd percent of her prior earnings. So that, I would suggest, is reasonable. And what you're looking at under any occupation standard is what is reasonable to put this person back into. The question that was put to her doctor excluded that consideration from the doctor's opinion, did it not? The doctor said he was unable to consider, yes, Your Honor, the answer is yes. The doctor said, Dr. Christensen said he didn't understand that he wasn't able to testify on that. Later on in his deposition, it became quite clear that the reason for that was because he's not a vocational specialist. He had not done any sort of transferable skills analysis, nor had he done any sort of an evaluation of what jobs might be available to her. He actually deferred to a vocational specialist in that regard. And that's exactly what Dr. Jansen has supplied, is that transferable skills analysis. And just on the last point with regard to that, I think that I did want to mention that the plaintiff in the briefing, has suggested at various points that in order for the any, excuse me, yes, the any occupation standard to apply, Ms. Arum would have to get a job paying her $80,000 a year. And I simply wanted to point out to the court that the any occupation standard does not require income matching. Taken as a whole, what we're looking at, again, is this reasonableness standard, putting somebody into something that is reasonable to expect them to do, considering their prior situation. And Ms. Arum's position is particularly untenable with this $80,000, because Ms. Arum did not earn $80,000 in the year before she became disabled. She earned, I think, $53,000 in the year before, excuse me, $52,000 in the year before she became disabled. Ms. Arum's lawyer has taken the second year before she became disabled and tried to write into the policy some requirement that for the any occupation standard to apply that Ms. Arum has to meet that. Indeed, I will go back and say that Dr. Janssen's range that he predicts was between $34,900 and $57,300 per year for occupations that she's able to do. And that does end up being 56% to 91% of her prior three years average, and that's including that spike in 1995 where she had an $81,000 year. In 1994 and in 1996, 1996 being the year before she became disabled, she was in the low $50,000 range. With respect to the Social Security, the payment of Social Security disability, the reason it doesn't create an issue of fact is really twofold. First, there's no evidence in this record that Ms. Arum received Social Security disability any time after January of 2000. The relevant time period in this case is after January of 2000, because Paul Revere paid Ms. Arum benefits for three years up to January of 2000. And I'm sure Mr. Parsons will correct me if I'm wrong, but I went back and looked, and I don't believe there's any evidence in this record that Ms. Arum was receiving Social Security disability during the time period that we're dealing with in this case. Secondly, the evidence in the record is that the Social Security Administration awarded disability benefits back in 1997, two and a half to three years before the relevant period in this case. I would suggest that that determination by that other trier of fact is so remote as to be irrelevant, let alone sufficiently. So you're really saying it's not probative, I think, rather than irrelevant, right? It's so, yeah, you know what, it's so non-probative that it can't even be relevant is my suggestion. And even if it's relevant, even if it's admissible. That's not how the rules of evidence read, is it? But I do see what you're saying, Your Honor, and I do agree. You've got a 1997 decision. It's just not sufficiently probative. That decision was based on nobody knows what, unknown evidence, unknown presumptions, because as we all know, the Social Security Administration. It's a matter of what it's based on, isn't it? The question of whether that decision is relevant or probative, however it was arrived at. Aren't there cases that say we ought to give way to that decision? It's admissible, that is, is it not? Well, the cases that were cited by the plaintiff in the reply brief are ERISA cases. And ERISA is a different situation. In an ERISA case, the trial court is essentially looking at the record that was before the plan administrator and determining whether the plan administrator had sufficient evidence, abused its discretion or sometimes, I guess, under de novo standard, deciding whether there's sufficient evidence to pay benefits. That's not the situation here where we're applying a summary judgment standard. So even if you assume it's relevant, and I think, you know, let's assume it's relevant, is it sufficiently probative to avoid summary judgment when all you have is a 1997 decision based on unknown facts, based on unknown presumptions. The Social Security Administration works off of these presumptions, these very detailed regulations about how to decide because they decide millions of claims each year. And it's unknown whether that was ever reviewed or updated in the two and a half years before our relevant time period occurred. Remember, Paul Revere paid benefits back in 1997. Paul Revere paid benefits for three years. What we're looking at is, is Ms. Arum entitled to benefits after January of 2000? And I would suggest that even if that Social Security disability determination from 1997 is admissible, it's certainly not sufficiently probative to preclude, to be specific evidence for. Was it a determination of permanent disability? Excuse me? Was it a determination of permanent disability, the Social Security decision? Your Honor, I cannot answer that question without looking back at it. My understanding is that it's a determination of disability at the time and that Social Security reviews its decisions at some period. It's expected to last for at least 12 months. Is that the kind of standard that's applied? I think it is that type of standard. But what we don't know is whether there was any review by the Social Security Administration any time after 1997. What we do know, of course, is that the Social Security Administration didn't have Dr. Christensen's testimony that his patient should and could have been working at some occupation all along. We know that the Social Security Administration didn't have the two independent medical examinations saying that this lady could work. And we know that the Social Security Administration did not have Dr. Jansen's vocational evaluation and assessment saying that Ms. Arum can work, that there are gainful occupations available to her, and that they can provide her with a substantial income. With respect to the second item that the plaintiff has noted, this January 2000 attending physician statement, the only thing I have to say about that is that was Dr. Christensen's statement, and Dr. Christensen testified later what he meant was Ms. Arum could and should have been working all along. To the extent that that is inconsistent with his deposition testimony, I suggest that one cannot avoid summary judgment by pointing out inconsistencies in one's own witness's testimony or evidence. Secondly, again, even if that January 2000 attending physician statement doesn't mean what Dr. Christensen testified in his deposition he meant by it, again, that is from January of 2000. It was filled out at a time that benefits were being paid. The relevant time period is after that, after benefits were ceased. And the last item very quickly here is regarding Dr. Christensen. Your time's up, so if you'll try to do it in a minute. Yes. Oh, my time's up? Oh, I'm sorry. Oh, that's all right. You can take a minute. First time. I'm not used to watching the clock. I apologize. Very quickly, with regard to this issue of training, Dr. Christensen didn't testify that Ms. Arum needed to have training. Dr. Christensen testified unequivocally, yes, I as a doctor, knowing this lady, knowing my patient, and just being a person, I think there are jobs she could have done. He didn't know what jobs, because he's not a vocational specialist. He testified very specifically, I didn't do a job training analysis. So, in fact, one other thing, it takes training to do any job. It takes training to run a cash register if you've not run one before. Anytime somebody goes into a job, you have to get training. The way the plaintiff is trying to construe this any occupation standard, that, well, if she has to have any training, if she has to do something she's not done before, then she cannot meet the any occupation standard, that actually turns this any occupation standard into an own occupation standard, and, of course, that would be impermissible. The own occupation standard applied under this policy for two years. We're now applying a different policy. To read it the way the plaintiff suggests would be to drastically alter the terms of the policy. And, again, I apologize for going over. Thank you, Catherine. If I may briefly go back to a couple of the points. First of all, even today, Ms. Andrews misleads this Court in saying somehow that because there's an occupation out there and her psychiatrist thought she should work, that she doesn't qualify for benefits. They didn't insure with the knowledge that if she could work somewhere, that she wouldn't get benefits. The clause is very specific. It says commensurate with your training, education, and experience, and based upon your prior economic status, and implicitly the law has imposed upon them a real-world consideration. For example, they couldn't impose that she could use buggy whips, even though there's no position for buggy whips in the present economy. Let me read you the list of positions that their expert purportedly found my client suitable for employment. They found her suitable for employment as a politician. They found her suitable for employment as a dancer. They found her suitable for employment as a singer, a fashion coordinator, a travel guide, a flight attendant, or a lawyer. Well, she could certainly run for governor of California. Your Honor, I am duly afraid that as Dorothy said to Toho in The Wizard of Oz in 1939, we're not in Kansas anymore, and arguing a case of California in the present occupation of the governor I think is a treacherous time. But the reality is, Your Honor, they're trying to avoid a trial with purported expertise saying that my client can do things that she's had no connection with at all. She's never been to law school. She's never worked as a travel agent. She's never worked as a singer other than singing in the shower. And just as Dr. Christensen testified at length, any occupation that he could fathom for this client would require extensive retraining. Their disability clause doesn't say with retraining. It simply says if you're not able to occupy employment based upon your education, training, and experience, given your economic status, you're disabled. They're trying to bootstrap themselves into finding that ONOC becomes quite literally a position of 30 or 40 years ago where if an insured could sit on a street corner with a tin can with pencils in it, that was employment and disqualified them for benefits. They wrote the clause. They're obligated to follow that clause. It's not for my client to come in and say, well, I'll retrain myself, where I really can be a singer. I'll go on one of those shows and I'll get my career going so that you don't have to pay me anymore. Well, you wouldn't quarrel with some minimal level, I assume, of retraining because any occupation other than the one that she's held for a period of time is something she obviously would have to get up to speed on, right? Your Honor, all I can suggest to the Court is it wasn't the clause that we enforced. It's the clause that we purchased. And so whether she's amenable to the training or even if she chooses not to accept that training, there's no obligation within that clause that requires her to go out and change fields. The clause says that by reason of your education, training, and experience. It doesn't talk about prospectively. It talks about where you are when you become disabled. And so I would suggest to the Court, otherwise you'd be empowering much the same as managed care, a disability carrier to tell people what they have to do to qualify for their benefits, such as we want you to go out and train, we want you to go out and try the disemployment, we want you to go out and subject yourself to the hazards of that employment. What the counsel for the appellee didn't point out was that Dr. Christensen was abundantly clear that he would not be able to think of any occupation for which she was suitable without further training, and he was worried that if any of them became stressful that she would decompensate, that was dangerous and could lead to her home lethality. Thank you, Judge. Thank you. This case is arguably submitted.
judges: Reinhardt, Graber, Shadur